# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 7, 2016

## STATE OF TENNESSEE v. MARIO JONES

**Appeal from the Criminal Court for Shelby County**
No. 12-06405      John W. Campbell, Judge

---

**No. W2015-01646-CCA-R3-CD  -  Filed December 28, 2016**

---

Following a jury trial, the Defendant, Mario Jones, was convicted of two counts of rape of a child involving two different victims.  He now appeals as of right from those convictions challenging the sufficiency of the evidence, noting that there was no forensic evidence to bolster the victims' narratives and asserting that those narratives lacked credibility.  Following our review, we conclude that the evidence was sufficient to support the Defendant's convictions.  Therefore, the trial court's judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Joseph S. Ozment (on appeal), and Larry E. Fitzgerald (at trial), Memphis, Tennessee, for the appellant, Mario Jones.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Abby Wallace and Will Cranford, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

For events occurring between August 1, 2009, and October 8, 2009, the Shelby County Grand Jury charged the Defendant with one count of rape of a child regarding

L.J.[1] and one count of rape of child regarding D.J. See Tenn. Code Ann. § 39-13-522. L.J. and D.J. were siblings, and the Defendant was the son of the victims' mother's then-boyfriend. The Defendant resided in the home with the victims during this timeframe and cared for the victims sometimes while their mother worked.

At the Defendant's June 2015 trial, the following facts were adduced. L.J. testified that she had four siblings: D.J., who was older than her, and two younger sisters. The youngest child and the Defendant had the same father.

L.J. testified that she was four years old when the Defendant lived with them. L.J. said that, one afternoon, she was sitting on the living room couch with her siblings watching television. During this time, the Defendant touched her "private part" underneath her clothes and "then licked his hands[,]" according to L.J. L.J. further explained that the Defendant "moved his hand" while he was touching her on the "[o]utside" of her body and that he instructed her not tell her mother or the Defendant's father about this.

L.J. continued, stating that the Defendant also asked her to touch his "private part" with her hand "[u]p inside his pants" while on the couch. She did not comply, so he forced her to put "his private part" in her mouth for about a minute, L.J. said. According to L.J., the Defendant's "private part" "was just still" while inside her mouth, and she was "[s]itting up" and he was "[s]itting down." She further explained: "[H]e tried to make me put it up in my mouth, but I didn't do it, and then he had put it and sticked [sic] it up in my mouth." She said that she told her siblings to tell their mother.

According to L.J., her brother first talked with their mother when she came home from work that evening, and then L.J. informed her mother about the incident. She was "nervous" to tell her mother "[b]ecause [she] thought that [the Defendant was] going to put his hands on [her]."

D.J. turned seven years of age during the August the Defendant lived with the family. According to D.J., the Defendant slept on the couch; D.J.'s sisters shared a room; but he had a room of his own. D.J. described one occasion when he was in the bathroom urinating and the Defendant came in and touched him on his penis. On a separate occasion, he was lying on his bed on his stomach about to go to sleep when the Defendant entered his bedroom. According to D.J., the Defendant pulled D.J.'s clothes down and then "pulled his [own] clothes off and . . . got a condom and put it on his d--k and put his d--k in [D.J.'s] butt." D.J. described that the condom came inside "[a] little square package" and that both the package and condom were yellow in color. D.J. said that it hurt and that he screamed when the Defendant did this to him, but his sisters were asleep in their bedroom. D.J. also testified that one time the Defendant forced him to

_____

[1] It is the policy of this court to refer to the victims of sexual assault and minors by their initials. To further protect the victims' anonymity, we will refer to their relatives by their initials as well.

2

suck the Defendant's penis, saying that he had to "[s]uck it or [he] would get a whupping."

D.J. said that he told his mother about the abuse "right away[.]" However, he was "nervous" when he told his mother about the incidents, explaining, "Well, me and my mom never had like a good relationship because she was always at work and so one day when she wasn't at work I told her." After he told, D.J. found out that something had been happening to his sister as well, although he maintained that he never saw any abuse.

On cross-examination, D.J. stated that, when the Defendant stuck his penis in D.J.'s anus, it was painful. According to D.J., the Defendant put his penis "all the way in[.]" D.J. confirmed that, after he told his mother about "these things," he received "plenty" of her attention.

The victims' mother testified that the Defendant lived with the family for about two months in 2009 and that the Defendant was twenty or twenty-one years old at that time. She confirmed that all of the girls slept in one bedroom and D.J. in another. She stated that she trusted the Defendant to care for her children while she worked. On October 10, 2009, D.J. came to her, saying that they "need[ed] to tell [her] something[,]" so she went and got L.J and T.J. and brought them into her bedroom. L.J. and D.J. then proceeded to tell her about the sexual abuse at the hands of the Defendant, who had moved out of the home two days before. She called the police, who arrived at the house immediately to investigate the allegations of abuse. At the request of the police, she took the children to the Child Advocacy Center for interviews, and she later accompanied them to the hospital for a forensic examination. The victims' mother acknowledged on cross-examination that none of her children ever expressed that they did not want to be around the Defendant.

Dr. Karen Lakin, testifying as an expert in the area of pediatric sexual assault and sexual assault examinations, stated that neither of the forensic evaluations performed on the victims revealed any abnormal injuries. Dr. Lakin explained that this was not unusual, however:

> Most of the time, in most of the studies that even look at sort of the percentages of times when we would even see physical findings in pediatric sexual assault cases, it's usually not more than three to five percent of the cases because pediatric . . . sexual assault is very different. The disclosures most often are very delayed in terms of when it's discovered an incident has occurred, which allows for time for injuries to heal by the time the children are examined. And then the second part of it is . . . related to when someone just says penetration or sexual assault, you have to be much more specific about what you're talking about, what actually happened. And

most of the time, the children cannot verbalize specifically what actually happened.

Accordingly, her examinations of the victims neither confirmed nor discounted sexual assault, in her opinion.

The Defendant testified on his own behalf. He confirmed that he lived in the residence during the relevant time period, but he denied ever touching the victims. According to the Defendant, he saw L.J. at a family reunion in 2010 and then saw all four of the children at a Christmas dinner in 2011. He said that the victims came up to him and hugged him at the dinner in 2011.

The jury convicted the Defendant as charged. He was sentenced to concurrent terms of twenty-five years for each Class A felony conviction. The Defendant perfected a timely appeal.

## ANALYSIS

On appeal, the Defendant argues only that the evidence is insufficient to sustain his convictions. Specifically, he contends that, because there was no forensic evidence of the rapes and the victims' accounts lacked credibility, his convictions must be reversed. The State responds that credibility determinations are the province of the jury, and the Defendant, therefore, cannot prevail in his challenge to the sufficiency of the evidence.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the

4

convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was found guilty of violating Tennessee Code Annotated section 39-13-522, which defines rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of the victim's . . . body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The State cited the following facts to support each count:

> In Count One, the [S]tate has elected to submit for your consideration the alleged act of the intrusion of the Defendant's penis into the anal opening of [D.J.] occurring in [D.J.'s] bedroom when he was six years old.

> In Count Two, the [S]tate has elected to submit for your consideration the alleged act of the intrusion of the Defendant's penis into the mouth of [L.J.] occurring in the living room when [L.J.] was four years old.

Review of the record reveals sufficient evidence to support the convictions. L.J. testified she was on the couch in the living room watching television when the Defendant forced her to put "his private part" in her mouth for about a minute. She explained that, during this time, the Defendant's "private part" "was just still." Furthermore, the Defendant had previously instructed her not to tell anyone, and L.J. said that she was "nervous" to tell her mother "[b]ecause [she] thought that [the Defendant was] going to put his hands on [her]." L.J. was four years old at the time. D.J., who turned seven in August 2009, testified that he was lying on his stomach in his bedroom one evening when the Defendant undressed them both and then stuck the Defendant's penis in D.J.'s anus. D.J. said it was painful and he screamed.

The Defendant's argument that the evidence is insufficient centers on his reliance upon the following facts: (1) L.J. testified that her siblings were present when the Defendant forced his penis into her mouth, but D.J. said he did not witness the incident; (2) the other children present in the house would have heard D.J.'s scream when the Defendant put his penis in D.J.'s anus, but "no such corroboration was offered by the

5

State"; and (3) the forensic examinations did not reveal any injuries to the victims' body. However, these credibility challenges to the victims' testimony do not entitle him to relief.

The fact that there was no forensic evidence of the sexual assaults does not entitle the Defendant to relief. First, forensic evidence is not required to establish proof of rape, as evidence may be sufficient to sustain a conviction for rape of a child when the only evidence is the testimony of the victim. See State v. Ed Loyde, No. W2014-01055-CCA-R3-CD, 2015 WL 1598121, at *3 (Tenn. Crim. App. Apr. 6, 2015) (citing State v. Collier, 411 S.W.3d 886, 891-92 (Tenn. 2013); State v. Smith, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000)), perm. app denied (Tenn. July 21, 2015). Second, the record reflects that at least several days had passed between the rapes and victims' disclosure to their mother. Their mother testified that the Defendant had moved out of the family's house in the preceding days. The victims were also very young children at the time of the rapes. Moreover, according to Dr. Lakin, the vast majority of pediatric sexual assault cases did not yield forensic evidence. See Loyde, 2015 WL 1598121, at *3. Finally, these inconsistencies pointed out by the Defendant were not "'so improbable or unsatisfactory as to create a reasonable doubt of the [Defendant's] guilt.'" State v. Elkins, 102 S.W.3d 578, 583 (Tenn. 2003) (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). As the final arbiter of credibility, the jury chose to resolve any discrepancies in victims' testimony in the State's favor. See Loyde, 2015 WL 1598121, at *4. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's two convictions for a rape of a child.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

6